UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

        -v.-

AKAYED ULLAH,

                  Defendant.

18 Cr. 16 (RJS)

## THE GOVERNMENT'S MOTIONS *IN LIMINE*

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Shawn G. Crowley
Rebekah Donaleski
George D. Turner
Assistant United States Attorneys
    *Of Counsel*

**TABLE OF CONTENTS**

BACKGROUND ......................................................................................................................... 1

    I.    The Charges .................................................................................................................. 2

    II.    The Evidence ................................................................................................................ 2

ARGUMENT ............................................................................................................................. 4

    I.    Evidence of Terrorist Propaganda Materials Possessed by Ullah Is Admissible ............... 4

        A.    Relevant Facts ........................................................................................................ 5

        B.    Applicable Law ...................................................................................................... 8

        C.    Discussion .............................................................................................................. 9

            1. The Terrorist Propaganda Materials Are Admissible as Direct Evidence ..................... 9

            2. The Terrorist Propaganda Materials Are Admissible Pursuant to Rule 404(b) ............ 17

    II.    The Court Should Take Judicial Notice of ISIS's Designation as an FTO ...................... 18

Conclusion ............................................................................................................................. 20

# TABLE OF AUTHORITIES

**Cases**

*Old Chief v. United States*, 519 U.S. 172 (1997)..................................................................... 9

*United States v. Abel*, 469 U.S. 45 (1984) ............................................................................. 8

*United States v. Abu-Jihaad*, 553 F. Supp. 2d 121 (D. Conn. 2008)........................................ 15

*United States v. Abu-Jihaad*, 630 F.3d 102 (2d Cir. 2010).............................................. passim

*United States v. Al Kassar*, 660 F.3d 108 (2d Cir. 2011) ....................................................... 12

*United States v. Alimehmeti*, No. S1 16 Cr. 398 (PAE) (S.D.N.Y. Jan. 5, 2018)....... 10, 13, 14, 20

*United States v. Al-Moayad*, 545 F.3d 139 (2d Cir. 2008) ..................................................... 16

*United States v. Carboni*, 204 F.3d 39 (2d Cir. 2000)........................................................... 18

*United States v. Coonan*, 938 F. 2d 1553 (2d Cir. 1991)......................................................... 9

*United States v. El Gammal*, No. 15 Cr. 88 (ER) (S.D.N.Y. Jan. 3, 2017) ............................... 20

*United States v. El-Mezain*, 664 F.3d 467 (5th Cir. 2011)................................................ 11, 14

*United States v. Gonzalez*, 110 F.3d 936 (2d Cir. 1997) ................................................... 9, 18

*United States v. Hammoud*, 381 F.3d 316 (4th Cir. 2004)...................................................... 14

*United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011) ................................................... 12

*United States v. Kaziu*, 559 F. App'x 32 (2d Cir. 2014)........................................................ 13

*United States v. Mehanna*, 735 F.3d 32 (1st Cir. 2013)................................................... 11, 14

*United States v. Mercado*, 573 F.3d 138 (2d Cir. 2009)........................................................ 17

*United States* v. *Pugh*, 162 F. Supp. 3d 97 (E.D.N.Y. 2016) ................................... 12, 13, 16, 17

*United States v. Reifler*, 446 F.3d 65 (2d Cir. 2006) .............................................................. 9

*United States v. Salameh*, 152 F. 3d 88 (2d Cir. 1998).......................................................... 14

*United States v. Wood,* 335 F.3d 993 (9th Cir. 2003)............................................................ 18

**Statutes**

18 U.S.C. § 1992........................................................................................................... 2

18 U.S.C. § 2332a.......................................................................................................... 2

18 U.S.C. § 2332f .......................................................................................................... 2

18 U.S.C. § 2339(a) .................................................................................................... 18

18 U.S.C. § 2339B ............................................................................... 2, 10, 12, 18

18 U.S.C. § 844(i) ....................................................................................................... 2

18 U.S.C. § 924(c) ...................................................................................................... 2

22 U.S.C. § 2656f ...................................................................................................... 12

44 U.S.C. § 1507 .................................................................................................. 18, 19

8 U.S.C. § 1182(a) .................................................................................................... 12

## Other Authorities

69 Fed. Reg. 61292 (October 15, 2014)..................................................................... 19

79 Fed. Reg. 27972 (May 15, 2014) .......................................................................... 19

80 Fed. Reg. 58804 (September 30, 2014) ................................................................. 19

## Rules

Fed. R. Evid. 201 ................................................................................................. 18, 19

Fed. R. Evid. 401 ........................................................................................................ 8

Fed. R. Evid. 402 ........................................................................................................ 8

Fed. R. Evid. 403 ........................................................................................................ 8

Fed. R. Evid. 404(b)................................................................................................... 18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-                                                    18 Cr. 16 (RJS)

AKAYED ULLAH,                                           **THE GOVERNMENT'S
                                                        MOTIONS _IN LIMINE_**

                    Defendant.

The Government respectfully submits these motions _in limine_ seeking the following

rulings in connection with the October 29, 2018 trial of defendant Akayed Ullah ("Ullah" or the

"defendant"):

1.  Evidence of certain terrorist propaganda materials recovered from a laptop used by the
    defendant is admissible.

2.  The Court should take judicial notice of the designation of the Islamic State of Iraq and
    al-Sham ("ISIS") as a foreign terrorist organization.

## BACKGROUND

On December 11, 2017, the defendant detonated a pipe bomb in a crowded subway

terminal in New York City for and in the name of ISIS.  The December 11 attack was the

culmination of the defendant's radicalization, which began as early as 2014, when he started

seeking out and viewing ISIS and other terrorist propaganda online, including videos depicting

bombings, combat operations, and suicide attacks executed by and on behalf of ISIS.

## I.    The Charges

The Indictment charges the defendant in six counts, all of which stem from his perpetration of the December 11, 2017 attack:

- Count One: Providing and attempting to provide material support or resources to a designated foreign terrorist organization ("FTO"), namely, ISIS, in violation of 18 U.S.C. § 2339B;

- Count Two: Using and attempting to use a weapon of mass destruction, in violation of 18 U.S.C. § 2332a(a);

- Count Three: Bombing and attempting to bomb a place of public use and a public transportation system, in violation of 18 U.S.C. § 2332f(a)-(b);

- Count Four: Destroying and attempting to destroy property by means of explosive, in violation of 18 U.S.C. § 844(i);

- Count Five: Committing and attempting to commit a terrorist attack against a mass transportation system, in violation of 18 U.S.C. § 1992(a)-(c); and

- Count Six: Using and carrying a destructive device during and in relation to, and possessing a destructive device in furtherance of, the crimes of violence charged in Counts One through Five of the Indictment, in violation of 18 U.S.C. § 924(c).

## II.    The Evidence

The Government will establish at trial—through evidence including eyewitness and law enforcement agent testimony, surveillance video, the defendant's statements, and terrorist propaganda videos that he possessed—that the defendant executed the bombing in order to terrorize as many people as possible and further ISIS's agenda and terrorist ideology.

The evidence at trial will establish that as early as 2014, the defendant began to seek out and consume materials espousing the terrorist ideology that ultimately motivated the December 11 attack.  He reviewed materials relating to terrorism, violent jihad, ISIS, and Anwar al-Awlaki,

2

a now-deceased senior member of al Qaeda in the Arabian Peninsula ("AQAP") who encouraged his followers to commit acts of martyrdom. Approximately a year before putting his attack plan into action, the defendant began to research how to build a bomb. In the weeks leading up to the attack, the defendant, using tools he acquired from his job as an electrician, built a pipe bomb in his Brooklyn home. He filled a metal pipe with homemade explosive powder and screws, wired the pipe with a Christmas-tree lightbulb, and attached a nine-volt battery to operate as the switch—that is, power source—of his bomb.

On the morning of December 11, 2017, the defendant strapped the pipe bomb to his chest using zip ties, and took the New York City subway from Brooklyn to the Port Authority Bus Terminal at West 42nd Street and Eighth Avenue in Manhattan. As Ullah rode the subway, he posted the following statement to his Facebook page: "O Trump you fail to protect your nation," along with an Arabic word that Ullah intended to convey to members of ISIS that the attack had been committed in the name of ISIS. At approximately 7:20 a.m., the defendant detonated the pipe bomb in a crowded subway terminal filled with Monday-morning commuters. The defendant fell to the ground after the explosion, and was taken into custody by law enforcement officers who responded to the bombing. Following his arrest, the defendant stated to law enforcement, in substance and among other things, that he had been inspired by ISIS to carry out the bombing, that he "did it for the Islamic State," and that he had carried out the attack in part because of the United States' policies in the Middle East. The defendant also described videos and lectures he had viewed online leading up to the attack, including lectures by al-Awlaki, and

3

videos that described various ways to conduct attacks to "terrorize America," such as bombings and truck attacks.

Law enforcement agents searched the defendant's home in Brooklyn following the December 11 attack, and recovered, among other things, materials consistent with those the defendant had used to construct the pipe bomb, as well as the defendant's passport, which contained the following statement scrawled in all capital letters:  "O AMERICA, DIE IN YOUR RAGE."  Law enforcement also recovered a laptop used by the defendant (the "Laptop"), which contained a substantial volume of ISIS and terrorism-related materials, including (1) an array of ISIS propaganda videos, including videos distributed by ISIS-affiliated media outlets, depicting ISIS fighters engaging in violent combat operations such as suicide bombings; and (2) various lectures by radical jihadist leaders, including al-Awlaki.

## **ARGUMENT**

### I.    **Evidence of Terrorist Propaganda Materials Possessed by Ullah Is Admissible**

At trial, the Government intends to introduce a small subset of the pro-ISIS and terrorist propaganda videos and audio files recovered from the Laptop, which was used by the defendant and recovered from the defendant's residence.  Specifically, the Government seeks to introduce excerpts of nine videos and portions of two audio lectures recovered from the Laptop (the "Terrorist Propaganda Materials"), which are attached hereto as Exhibit A.[1]

---

[1] Each of the video excerpts the Government intends to offer is under one minute long.

As explained below, the Terrorist Propaganda Materials are highly relevant to the crimes charged, as they tend to show, among other things, that Ullah embraced a terrorist ideology, supported ISIS in particular, and believed himself and other Muslims to have been called to wage violent jihad in ISIS's name. As discussed below, these materials' significant probative value outweighs any potential prejudicial effect, particularly given that the video excerpts omit especially graphic portions from the videos. Accordingly, the Government respectfully seeks a pretrial ruling that the Terrorist Propaganda Materials are admissible.

### A. Relevant Facts

The Government expects to present expert testimony at trial regarding, among other terrorism-related topics, ISIS, ISIS's leader, Abu Bakr al-Baghdadi ("al-Baghdadi"), AQAP, and al-Awlaki.[2] Such testimony will explain, in substance and among other things, the following: ISIS, a militant Islamist group based in Iraq and Syria and with branches in other countries in the Middle East and Africa, has existed in various iterations since at least 2004, and rose to prominence in 2014 when it declared itself a caliphate and consolidated its campaign to amass territory in the Middle East and drive westerners from the region. ISIS has planned, carried out, and claimed responsibility for terrorist attacks around the world, including in the United States and Europe. ISIS has also claimed credit for, and glorified, taking westerners as prisoners and executing them, often by decapitation. Al-Baghdadi, an Iraqi, is recognized as the current leader

---

[2] On August 7, 2018, the Government provided notice to the defense of its intent to offer expert testimony on these topics.

of ISIS.  In the summer of 2014, al-Baghdadi gave a speech in Mosul, Iraq, in which he promoted the return of the Islamic caliphate and declared himself to be its caliph, or leader.  Al-Baghdadi subsequently gave speeches in which he—like Abu Mohammed al-Adnani, a prominent, now-deceased ISIS spokesman—called for ISIS supporters to kill non-Muslims, in any manner possible, in the United States and other western countries.

ISIS uses various social media platforms and websites to issue a steady stream of propaganda and terrorism-related content in several languages, including English.  Such propaganda materials include calls for followers to commit terrorist attacks, including lone-wolf attacks—like the defendant's December 11 attack—against westerners.  ISIS also uses such propaganda to recruit followers from around the world to travel to the Middle East to join ISIS.  ISIS's recruiting efforts have relied heavily on the use of the Internet, including web-distributed propaganda videos designed to motivate foreign fighters to leave their homelands and join ISIS overseas.  In particular, ISIS's propaganda wings have regularly disseminated professionally produced videos that glorify the violent exploits of ISIS's fighters, proclaim ISIS's aim of establishing a global caliphate, and seek to recruit new members and fighters.  Such videos often depict, among other things, ISIS fighters marching, committing bombings, training, fighting, and beheading and shooting captives.

AQAP was founded in 2009 and is considered the official branch of al Qaeda in Yemen and Saudi Arabia.  AQAP's primary goal is to establish an Islamic caliphate and rid Muslim-majority countries of western governments and influences.  AQAP has called for, carried out, and claimed responsibility for terrorist attacks against Americans and other western civilian and

6

military targets in the United States and Europe, among other places.  Al-Awlaki was a Yemeni-American who was born in the United States, became an imam and Islamic lecturer, and ultimately emerged as a senior AQAP leader and ideologue.  Before his death in 2011, al-Awlaki helped plan terrorist attacks in the United States and the United Kingdom, among other countries.  Al-Awlaki released numerous video and audio recordings of his lectures and sermons in which he preached that it was the duty of every Muslim to kill Americans, by whatever means possible and wherever they could be found.  ISIS supporters have drawn inspiration from AQAP's ideology and propaganda, and from al-Awlaki's lectures and teachings.  AQAP continues to issue calls for Muslims to wage jihad and commit lone-wolf attacks against Americans.

At trial, the Government anticipates offering the Terrorist Propaganda Materials recovered from the Laptop found in Ullah's residence, which include various videos and audio files promoting and glorifying jihadist and terrorist ideology, and particularly ISIS.  This content constitutes strong evidence—consistent with the statements the defendant made during and after his arrest—that Ullah adhered to a terrorist ideology, supported ISIS, and carried out the December 11 attack in its name.  The Terrorist Propaganda Materials are summarized below:[3]

- ISIS Propaganda Videos.  Portions of nine ISIS propaganda films, including videos disseminated by ISIS media outlets such as al Hayat Media Center.  These videos glorify ISIS—including its leaders, extremist agenda, anti-Western

---

[3] Portions of certain of the Terrorist Propaganda Materials are in Arabic and/or Bengali.  The Government anticipates either offering English translations of the foreign language portions of the Terrorist Propaganda Materials that are introduced at trial, or omitting the foreign-language audio from the Terrorist Propaganda Materials played at trial.

7

ideology, military exploits, and the killing of non-believers—and call for Muslims around the world to join ISIS and serve its cause.  The ISIS flag is superimposed in the background at various points during such videos.  The videos depict, in large part, ISIS fighters engaging in violent combat operations, including attacks with assault rifles and improvised explosive devices.  The excerpts of the ISIS propaganda videos the Government will offer include (among other things) footage of ISIS fighters carrying out violent combat operations and attacks, including bombings.  As discussed below, it is essential for the jury to see such footage in order to understand the nature of the terrorist ideology espoused and adopted by Ullah, who himself committed a terrorist bombing in the name of ISIS.  However, in an abundance of caution, the Government will not include in the excerpts offered at trial any footage of executions as they are actually carried out, or any footage showing severed heads or mutilated bodies resulting from such executions, bombings, or attacks.  *See* Ex. A, Videos 1-9.

- Anwar al-Awlaki Lectures.  Portions of two audio files containing lectures by al-Awlaki.  Among other things, the al-Awlaki lectures promote violent jihad, martyrdom, and terrorist ideology.  *See* Ex. A, Audio Lectures 1-2.

As noted, the Terrorist Propaganda Materials the Government intends to offer at trial, *i.e.*, the excerpts of the video and audio files summarized above, are attached hereto as Exhibit A. The Government reserves the right to identify additional Terrorist Propaganda Materials that it intends to offer at trial, as the Government prepares and finalizes its exhibits.

### B.  Applicable Law

Federal Rules of Evidence 401 and 402 establish the broad principle that relevant evidence is admissible at trial except as otherwise provided by the Constitution, federal statute, or Rules of Evidence.  *See* Fed. R. Evid. 401, 402; *United States v. Abel*, 469 U.S. 45, 51 (1984). Rule 403 allows a trial judge to exclude relevant evidence if, among other things, "its probative value is substantially outweighed by a danger of . . . unfair prejudice."  Fed. R. Evid. 403.

8

"To be relevant, evidence need not be sufficient by itself to prove a fact in issue, much less to prove it beyond a reasonable doubt." *United States v. Abu-Jihaad*, 630 F.3d 102, 132 (2d Cir. 2010). Rather, evidence is relevant if it has any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence. Fed. R. Evid. 401; *see United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997) ("To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency."). Thus, evidence is often admissible "to provide background for the events alleged in the indictment" or "to enable the jury to understand the complete story of the crimes charged." *United States v. Reifler*, 446 F.3d 65, 91-92 (2d Cir. 2006) (internal quotation marks omitted). "Background evidence may be admitted to show, for example, the circumstances surrounding the events, or to furnish an explanation of the understanding or intent with which certain acts were performed." *United States v. Coonan*, 938 F. 2d 1553, 1561 (2d Cir. 1991) (internal quotation marks omitted). As the Supreme Court has recognized, in analyzing the admissibility of evidence, the trial court should make its determinations "with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case." *Old Chief v. United States*, 519 U.S. 172, 183 (1997).

## C. Discussion

### 1. The Terrorist Propaganda Materials Are Admissible as Direct Evidence

The Terrorist Propaganda Materials are highly relevant in multiple respects and admissible as direct proof of the charged terrorism offenses.

9

*First*, the Terrorist Propaganda Materials constitute direct evidence of Ullah's motivations for the December 11 attack, and specifically his intent to provide support to ISIS, an element of the material-support offense charged in Count One, *see* 18 U.S.C. § 2339B.  Based on Ullah's statements to law enforcement and the Facebook post described above, among other evidence, Ullah viewed himself as part of the global jihadist movement, and was inspired to commit the December 11 attack at least in part by the Terrorist Propaganda Materials that he stored and viewed on the Laptop.  Ullah's immersion in such materials leading up to the December 11 attack is an important piece of the Government's proof demonstrating and explaining that the defendant had radicalized and intended to support ISIS through carrying out the attack.  The Terrorist Propaganda Materials on the Laptop tend to show, among other things, that Ullah subscribed to, and was motivated by, a jihadist and terrorist ideology, and that he committed the attack for and in the name of ISIS in particular, consistent with his post-arrest statements.  *See United States v. Alimehmeti*, No. S1 16 Cr. 398 (PAE), Dkt. No. 96 (Jan. 5, 2018) ("*Alimehmeti*") (attached hereto as Exhibit B), at 15 (allowing the introduction of terrorist propaganda materials possessed by the defendant in case involving § 2339B charge in order to provide "important background for the events alleged in the indictment[,]" and because the materials provided "essential context for the Government's allegation that [the defendant] became radicalized . . . at least in part through his exposure to and apparent enthusiasm for such materials") (internal citation and quotation marks omitted).

Evidence of Ullah's possessing and viewing the Terrorist Propaganda Materials also is inextricably intertwined with the Government's other evidence—including Ullah's own

10

admissions to law enforcement about his path to radicalization and motivation for the attack, the pro-ISIS Facebook message he posted shortly before committing the attack, and the statements found on his passport and elsewhere in his personal belongings, for example: "AMERICA, DIE IN YOUR RAGE"—such that presentation of those materials is necessary for the jurors to appreciate the complete story of Ullah's conduct and intent in committing the attack. For jurors to understand the events leading up to the December 11 bombing, including Ullah's radicalization, his embrace of terrorist ideology and ISIS, and his desire to commit a lone-wolf attack targeting Americans, it is essential that the Government introduce the radical propaganda materials that Ullah absorbed and embraced during the period of his radicalization and attack plotting. Ullah's immersion in the Terrorist Propaganda Materials glorifying martyrdom in the name of jihad, celebrating ISIS's military campaigns and killing of civilians, and spewing anti-U.S. sentiment, is an important aspect of the circumstances surrounding Ullah's efforts to support ISIS and crucial to explaining the motive and intent with which he undertook the charged criminal conduct. *See Abu-Jihaad*, 630 F.3d at 133-34 (affirming district court's finding that the "pro-jihadist contents of the [terrorist propaganda] videos were relevant to understanding [the defendant's] motive and intent"); *United States v. Mehanna*, 735 F.3d 32 (1st Cir. 2013) (holding that videos, images, and literature that defendant had "absorbed and endorsed" were admissible to establish that defendant was "inspired by terrorist rants" and "developed an anti-American animus" that culminated in his decision to travel to Yemen to join al-Qaeda); *United States v. El-Mezain*, 664 F.3d 467, 509-10 (5th Cir. 2011) (holding that material seized from defendant, "including images of violence and videos glorifying Hamas and depicting Hamas

11

leaders, was probative of the motive or intent of the [defendant] to support Hamas"); *United States v. Jayyousi*, 657 F.3d 1085, 1108 (11th Cir. 2011) (holding that televised interview with bin Laden was properly admitted as "state of mind evidence").

*Second*, the Terrorist Propaganda Materials are highly probative of Ullah's knowledge that ISIS was a designated FTO or has engaged in "terrorist activity" or "terrorism," which is another element of the material-support offense charged in Count One. *See* 18 U.S.C. § 2339B(a)(1); *United States v. Al Kassar*, 660 F.3d 108, 129 (2d Cir. 2011) (§ 2339B requires proof that defendant knows that "the organization he is aiding is a terrorist organization or engages in acts of terrorism"); *see also* 8 U.S.C. § 1182(a)(3)(B) (defining "terrorist activity" for purposes of § 2339B to include any unlawful activity involving the use of any "explosive, firearm, or other weapon or dangerous device . . . with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property," or "[a] threat, attempt, or conspiracy to do any of the foregoing"); 22 U.S.C. § 2656f(d)(2) (defining "terrorism" for purposes of § 2339B to include "premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents").

Here, the Laptop contained materials depicting, among other things, ISIS's murder of civilians, military combat operations, promotion of lone-wolf attacks, and threats against the West. Such materials constitute powerful, direct evidence of Ullah's knowledge that ISIS is a terrorist group that engages in terrorism and terrorist activity. *See, e.g.*, *United States v. Pugh*, 162 F. Supp. 3d 97, 114 (E.D.N.Y. 2016) (agreeing, as conceded by defendant charged with providing material support to ISIS, that "the fact that [the defendant] possessed certain ISIS or

12

Jihadist propaganda on his computer or social media is potentially relevant to the charged offenses," and noting that "[t]he Second Circuit has regularly allowed terrorist propaganda to be admitted, particularly in the context of material support offenses, in order to prove the *mens rea* element of the offense" (citing *United States v. Kaziu*, 559 F. App'x 32, 35 (2d Cir. 2014); *Abu-Jihaad*, 630 F.3d at 133-34)); *Alimehmeti* at 17 (admitting ISIS propaganda materials because the materials "bear on whether [the defendant] had the required state of mind" and tend to demonstrate the defendant's "knowledge that ISIS was a designated FTO involved in terrorism"). There is, in short, no question that the Terrorist Propaganda Materials are directly relevant to the terrorism offenses charged against Ullah, and particularly the material-support offense charged in Count One.

The admission of the Terrorist Propaganda Materials does not run afoul of Rule 403. The probative value of this evidence is not outweighed, much less "substantially outweighed," by any risk of unfair prejudice. Ullah committed a terrorist bombing for and in the name of a brutally violent terrorist organization, and possessed videos and other materials glorifying and promoting the group's violent agenda. As discussed above, this evidence is highly probative of Ullah's knowledge and intent. Any argument that the potential unfair prejudicial effect of such evidence substantially outweighs its probative value is meritless. Indeed, numerous courts "confronting similar Rule 403 issues have found that jihadist propaganda videos and documents found in a defendant's possession are admissible to show intent in a material-support case, despite the fact that such videos and documents risk prejudice." *Pugh*, 162 F. Supp. 3d at 115; *see, e.g.*, *Abu-Jihaad*, 630 F.3d at 132-34 (affirming district court's admission of excerpts of jihadist

13

propaganda videos including graphic combat scenes); *United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998) (per curiam) (affirming district court's admission, over defendant's Rule 403 challenge, of "terrorism propaganda documents, possessed by the defendants, which bristled with strong anti-American sentiment and advocated violence against targets in the United States," reasoning that the materials evidenced the defendant's motive and also "provided the jury with background and an explanation of the understanding or intent with which certain acts were performed" (internal quotation marks omitted)); *Mehanna*, 735 F.3d at 59-64 (finding terrorist propaganda admissible in material-support trial because it was highly probative to state of mind and "central to the government's narrative"); *United States v. El-Mezain*, 664 F.3d 467, 508-11 (5th Cir. 2011) (admitting terrorist propaganda evidence in material-support case over defendant's Rule 403 challenge, and stating: "Because this [is] a case about supporting terrorists, it is inescapable . . . that there [will] be some evidence about violence and terrorist activity.  It cannot be denied that [such] evidence [will be] unfavorable to the defendant[], but [the court] cannot conclude that it [will be] unduly prejudicial."); *United States v. Hammoud*, 381 F.3d 316, 340-42 (4th Cir. 2004) (admitting evidence of terrorist propaganda videos found in defendant's home because they were relevant to motive and were not unduly prejudicial); *Alimehmeti* at 17 (rejecting defendant's Rule 403 challenge and finding that terrorist propaganda was admissible in material-support case "to establish [the defendant's] knowledge of ISIS's designation and its involvement in terrorism," and noting approvingly that the Government did not intend to offer depictions of "graphic violence").

14

The Second Circuit's decision in *Abu-Jihaad* is instructive.  The defendant in *Abu-Jihaad*, an enlistee in the U.S. Navy, was convicted of communicating the anticipated movements of a U.S. Navy battlegroup to persons supportive of violent jihad.  The Second Circuit affirmed the district court's determination that the probative value, on the question of the defendant's motive and intent, of video excerpts offered by the Government that depicted violent combat scenes—"including an execution and a suicide truck bombing"—outweighed the risk of undue prejudice.  *Abu-Jihaad*, 630 F.3d at 113 n.12, 132-34.  The Second Circuit observed that, "[a]lthough these excerpts included depictions of violence, as was necessary not to distort the sense of the films as a whole, the depictions were limited and . . . less gruesome than many seen on nightly news dispatches from Baghdad." *Id.* at 102 (internal quotation marks omitted).  The district court, in the ruling affirmed by the Second Circuit, held that because the videos glorified martyrdom and the killing of non-believers, they constituted significant evidence of the defendant's intent.  *See United States v. Abu-Jihaad*, 553 F. Supp. 2d 121, 128 (D. Conn. 2008) ("[I]t is difficult—if not impossible—for the Government to give the jury an accurate sense of the nature of these videos without playing for the jury some of the violent and graphic portions of the videos.  Otherwise the jury would have an inaccurate sense of their content.").  The same is true here.  Moreover, as explained above, the Terrorist Propaganda Materials are hardly divorced from the charged conduct; rather, they constitute powerful, direct evidence of the *mens rea* required for the § 2339B violation charged in Count One, and of the defendant's motivation for carrying out the terrorism-related offenses charged in the other counts of the Indictment, all of which stem from his December 11 attack in support of ISIS.  *Cf. United States v. Al-Moayad*,

15

545 F.3d 139, 159-61 (2d Cir. 2008) (finding that district court erred in admitting lengthy testimony regarding suicide bus bombing, during which witness repeated graphic narrative multiple times, where the events were "almost entirely unrelated to elements of the charges").

Furthermore, as reflected in the descriptions of the Terrorist Propaganda Materials set forth above, the Government intends to offer only short excerpts from a small number of audio and video files that either do not contain any graphic content whatsoever, or that depict violence (such as explosions, the use of artillery, the firing of automatic weapons, and various forms of combat) only indirectly or from a distance.  While certain of the videos on the Laptop do depict more graphic violence, including executions, the excerpts selected by the Government for introduction at trial, *see* Ex. A, do not, in an abundance of caution, show any such executions or the aftermath of those executions or attacks, in order to avoid any risk of unfair prejudice.  *See, e.g.*, *Pugh*, 162 F. Supp. 3d at 117-18 (admitting ISIS propaganda videos located on defendant's laptop showing mass executions and the rounding up and beheading of prisoners, provided that the Government edited the clips that it showed at trial to leave out the executions and beheadings, reasoning that while the proffered clips "show[] executioners, wielding knives, in the moments before an unseen execution," which is naturally "viscerally disturbing," such evidence "speaks strongly to [the defendant's] state of mind" and was not "unduly prejudicial").

Because it is impossible to grasp the full force of such propaganda videos without gaining at least some sense of the brutal violence that the videos seek to glorify, the Government anticipates that its terrorism expert, Aaron Zelin, will briefly summarize certain of the violence that has been omitted from the excerpts played at trial through the testimony of law enforcement

16

and/or expert witness testimony.  Finally, the Government notes that, to the extent the Court has any concern about the risk of unfair prejudice in connection with the admission of the Terrorist Propaganda Materials, any such concern can be addressed through a limiting instruction to the jury—particularly given that the charges themselves involve a violent terrorist bombing.  *See United States v. Mercado*, 573 F.3d 138, 142 (2d Cir. 2009) (upholding Rule 403 determination where challenged evidence was "not especially worse or shocking than the transactions charged" and district court "gave several careful instructions to the jury regarding what inferences it could draw from the admitted evidence"); *Abu-Jihaad*, 630 F.3d at 134 (proper limiting instruction minimizes risk of undue prejudice from admission of relevant terrorist propaganda materials); *Pugh*, 162 F. Supp. 3d at 118 ("[T]o the extent the risk of unfair prejudice arises at trial, the court will issue an appropriate limiting instruction at the appropriate time and at the request of the Defendant.").

In sum, the Terrorist Propaganda Materials are plainly relevant to establishing Ullah's commission of the charged offenses, and any risk of unfair prejudice does not substantially outweigh the probative value of the evidence, particularly given that the Government has excised particularly graphic content from those materials.  Accordingly, the Government respectfully requests that the Court enter an order that such evidence is admissible at trial.

### 2. The Terrorist Propaganda Materials Are Admissible Pursuant to Rule 404(b)

As explained above, the Terrorist Propaganda Materials are properly admitted as direct proof of the charged offenses.  *See United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (articulating well-established principle that evidence is not considered other act evidence under

17

Rule 404(b) if it is inextricably intertwined with the evidence of the charged offense or necessary to complete the story of the charged offense (citing *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997))); *see also* Weinstein's Federal Evidence § 404.20[2][c] (observing that evidence the absence of which "would leave a chronological or conceptual void in the story of the crime" is "intrinsic evidence, and thus not governed by Rule 404"). In any event, the Terrorist Propaganda Materials are also admissible pursuant to Rule 404(b) as other act evidence of Ullah's preparation, plan, knowledge, motive, intent, absence of mistake, and lack of accident. As discussed above, the evidence is highly probative of Ullah's knowledge of ISIS's existence, goals, and terrorist activities, and of his motive and intent for knowingly and intentionally engaging in activities supportive of ISIS and its terrorist ideology.

## II.    The Court Should Take Judicial Notice of ISIS's Designation as an FTO

The Government respectfully requests that the Court take judicial notice at trial of the designation of ISIS as an FTO, effective October 15, 2004. ISIS's designation as an FTO is an element of Count One of the Indictment. *See* 18 U.S.C. §§ 2339B(a)(1), 2339(a).

The Federal Rules of Evidence allow a court to take judicial notice of adjudicative facts—such as whether ISIS is, in fact, a designated FTO—when those facts "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1). Further, federal courts are required to judicially notice items published in the Federal Register. *See* 44 U.S.C. § 1507 (providing that "[t]he contents of the Federal Register shall be judicially noticed"); *United States v. Wood,* 335 F.3d 993, 1001 (9th Cir. 2003) (holding

18

that the district court complied with federal law by judicially noticing a rule published in the

Federal Register).

As to ISIS, the relevant portions of the Federal Register include the following:

- On October 15, 2004, the U.S. Secretary of State designated al-Qa'ida in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224. *See* 69 Fed. Reg. 61292 (October 15, 2014).

- On May 15, 2014, the Secretary of State amended the designation of AQI as an FTO to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. *See* 79 Fed. Reg. 27972 (May 15, 2014). The Secretary also added the following aliases to the ISIL listing: the Islamic State of Iraq and al-Sham ("ISIS"), the Islamic State of Iraq and Syria, ad-Dawla al Islamiyya fi al-'Iraq wa'sh'Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. *Id.*

- On September 21, 2015, the Secretary of State added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. *See* 80 Fed. Reg. 58804 (September 30, 2014).

To date, ISIS remains a designated FTO. *See* U.S. Dep't of State, Foreign Terrorist

Organizations, http://www.state.gov/j/ct/rls/other/des/123085.htm (last visited Sept. 25, 2018).

Based on the foregoing, and pursuant to 44 U.S.C. § 1507 and Rule 201, the Government

respectfully requests that the Court take judicial notice of the fact that the Islamic State of Iraq

and al-Sham—including its aliases the Islamic State of Iraq and the Levant, the Islamic State of

Iraq and Syria, ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, Al-

Furqan Establishment for Media Production, Islamic State, ISIL, and ISIS—is designated as an

FTO, as determined by the U.S. Secretary of State and published in the Federal Register. In the

recent *El Gammal* prosecution, Judge Ramos granted a similar motion *in limine* by the

19

Government, and issued an order taking judicial notice of ISIS's designation as an FTO.  Order,

*United States v. El Gammal*, No. 15 Cr. 88 (ER), Dkt. No. 139 (Jan. 3, 2017); *see also*

*Alimehmeti* at 30-31 (granting Government's substantially identical motion and stating that the

Court would so-order the Government's proposed order absent a stipulation).  A proposed order,

substantially identical to the order issued in *El Gammal*, is attached as Exhibit C.[4]

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that the Court should grant

the relief requested herein.

Dated: New York, New York
       September 27, 2018

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

By:                /s/
Shawn G. Crowley
Rebekah Donaleski
George D. Turner
Assistant United States Attorneys
212-637-1098 / 2423 / 2562

---

[4] The Government will confer with the defense in an effort to craft a stipulation regarding ISIS's designation as an FTO.  If those discussions lead to a stipulation obviating the need for the relief sought in Part II herein, the Government will promptly advise the Court.