UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                :

UNITED STATES OF AMERICA,           :

               -v-                      :             S1 16-CR-398 (PAE)

                                :

SAJMIR ALIMEHMETI,              :             <u>OPINION & ORDER</u>

                                :

               Defendant.         :

                                :

------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

Defendant Sajmir Alimehmeti is charged in a two-count Superseding Indictment with (1) knowingly and intentionally providing and attempting to provide material support to a foreign terrorist organization ("FTO"), namely, the Islamic State of Iraq and al-Sham ("ISIS"), in violation of 18 U.S.C. §§ 2339B and 2; and (2) attempting to fraudulently procure a United States passport to facilitate an act of international terrorism in violation of 18 U.S.C. § 1542. Dkt. 70. Trial is set to commence January 29, 2018.

Pending before the Court are the parties' fully briefed motions *in limine*, which cover a variety of subjects. *See* Dkts. 72 ("Gov't Mot."), 74 ("Def. Mot."), 88 ("Gov't Opp."), 95 ("Def. Opp."). This decision resolves Alimehmeti's motion and most aspects of the Government's.[1] The Court also addresses, and rejects, a defense claim that the Superseding Indictment returned in late November materially changed the issues to be tried.

---

[1] In a separate decision, the Court will resolve the Government's motion that seeks partial courtroom closure and implementation of certain protective measures with regard to material the Government expects to produce pursuant to 18 U.S.C. § 3500 and/or *Giglio v. United States*, 405 U.S. 150 (1972).

1

Case 1:16-cr-00398-PAE  Document 96   Filed 01/03/18  Page 2 of 33

## I.     Factual Background[2]

The Government anticipates proving the following at trial:

Alimehmeti is a 24-year-old native of Albania who, prior to his May 2016 arrest in this case, resided in the Bronx.

On October 24, 2014, Alimehmeti was denied entry into the United Kingdom at Manchester Airport after U.K. authorities discovered camouflage clothing and nunchucks in his luggage.

On December 18, 2014, Alimehmeti was again denied entry into the U.K. at Heathrow Airport. Afterwards, U.K. authorities seized a laptop computer and cellphone from him. Those devices contained what the Government describes as "terrorist propaganda materials." These include images of jihadist fighters and the black flag used by ISIS, multiple videos disseminated by ISIS media outlets celebrating military exploits and executions of captives, and audio files of lectures promoting jihad and martyrdom by Anwar al-Awlaki, the now-deceased leader of al Qaeda in the Arabian Peninsula. The devices also contained images of Alimehmeti making an index-finger-pointing gesture commonly used to indicate support for ISIS. Further, the devices contained records of an online chat in which Alimehmeti attempted to facilitate an ISIS supporter's travel to Syria to join ISIS by providing contact information for an ISIS member who could arrange the travel. He also displayed an ISIS flag on his apartment wall.

In spring 2015, Alimehmeti began to purchase knives and military-style gear over the internet. That September, two undercover law enforcement officers ("UC-1" and "UC-2") made

---

[2] The following summary of the facts the Government intends to establish at trial is based on the allegations set forth in the Complaint on the basis of which Alimehmeti was arrested in May 2016 and the Government's memorandum of law in support of its motions *in limine*. *See* Dkts. 1, 72. The Court recites these allegations solely to provide context for the motions *in limine*.

2

contact with Alimehmeti through his associates. During the ensuing months, Alimehmeti participated in numerous recorded meetings with UC-1 and UC-2. During these, Alimehmeti repeatedly expressed support for ISIS, played ISIS propaganda videos, and indicated his desire to travel to Syria to join ISIS.

On October 23, 2015, Alimehmeti submitted an application for a U.S. passport. There, he claimed that he had lost his passport by leaving it on a train. During conversations with the undercover officers, however, Alimehmeti confided that his passport had not been lost, and that he instead sought a clean passport to facilitate his efforts to travel abroad to join ISIS.

Meanwhile, Alimehmeti continued to voice support for ISIS with other associates. In November and December 2015, Alimehmeti told one ISIS supporter by phone that he wished to join ISIS. He told another that he sought to radicalize other individuals in his neighborhood.

In February 2016, UC-2 introduced Alimehmeti to another undercover FBI employee ("UC-3") posing as an ISIS supporter. On May 9, 2016, UC-2 showed Alimehmeti a photograph of UC-3 indicating that UC-3 had successfully reached Syria and joined ISIS. Alimehmeti expressed his excitement and desire to be put in contact with the "connections" who had purportedly facilitated UC-3's travel.

On May 16, 2016, UC-2 told Alimehmeti that an associate of UC-3—in fact, another undercover FBI employee ("UC-4")—planned to travel to New York the following day in anticipation of flying to Syria to join UC-3. Alimehmeti indicated he would like to travel with UC-4. During the same meeting, Alimehmeti played an ISIS propaganda video showing the decapitation of a captive set to Islamic music. He stated that such videos motivated him while he exercised.

3

The next day, UC-2 introduced Alimehmeti to UC-4.  Alimehmeti asked UC-4 how he intended to reach Syria.  Alimehmeti explained that he had saved $2,500 for his own travel to join ISIS once he had obtained a passport in a different name.  UC-2 then asked if Alimehmeti would assist UC-4 by taking him to obtain supplies and then accompanying him to the airport.

Alimehmeti agreed and took UC-4 to several stores.  There, he helped UC-4 select and purchase supplies including boots, a cellphone, a compass, a bag, and a flashlight.  Alimehmeti also advised UC-4 regarding the most secure encrypted messaging applications to use in communicating with other ISIS members.  Alimehmeti then escorted UC-4 via subway to a hotel in Queens to meet with the individual who purportedly had secured UC-4's travel documents.  While waiting in the hotel lobby for UC-4 to return, Alimehmeti downloaded encrypted messaging applications onto the cellphone that he had helped UC-4 purchase.  He also wrote his contact information on a piece of paper and asked UC-4 to give it to the purported facilitator.  At some point that day, Alimehmeti also told UC-4 that he was "ready to fucking go with" UC-4 to Syria.  Following the meeting with the purported facilitator, Alimehmeti accompanied UC-4 to John F. Kennedy International Airport, where UC-4 was to begin his purported journey to Syria.

## II.    Procedural History

### A.    The Complaint and the Indictments

On May 23, 2016, a sealed Complaint was filed, on the basis of which a warrant was issued for Alimehmeti's arrest.  Dkts. 1–2.  On May 24, 2016, the FBI arrested Alimehmeti.  A search of his apartment revealed an ISIS flag, combat knives, military-style equipment, $2,400, and a cellphone and laptop containing various forms of terrorist propaganda.  The same day, the Complaint was unsealed.

On June 7, 2016, a grand jury returned Indictment 16 Cr. 398 (PAE). It charged Alimehmeti with one count of providing material support to an FTO in violation of 18 U.S.C. §§ 2339B and 2 ("Count One"); and one count of attempting to fraudulently procure a U.S. passport in violation of 18 U.S.C. § 1542 ("Count Two"). *See* Dkt. 8. On June 9, 2016, Alimehmeti entered a plea of not guilty. Dkt. 12 at 5.

On May 8, 2017, this Court granted the Government's *ex parte* motion for a protective order pursuant to the Classified Information Procedures Act, 18 U.S.C. App. 3 ("CIPA"). Dkt. 54. And on September 22, 2017, the Court denied Alimehmeti's motion to suppress certain evidence obtained and derived from searches conducted pursuant to the Foreign Intelligence Surveillance Act ("FISA"). Dkt. 67.

On November 28, 2017, the grand jury returned a Superseding Indictment, S1 16 Cr. 398 (PAE). It was identical in all material respects to the original Indictment, save that it modified Count Two so as now to charge Alimehmeti with attempting to fraudulently procure a U.S. passport specifically to facilitate an act of international terrorism. Dkt. 70.

## B.     The Motions *in Limine*

On December 8, 2017, the parties filed motions *in limine*.

Alimehmeti brings one motion: He asks the Court to preclude the Government from cross-examining Alimehmeti on his prior convictions. *See* Dkt. 74.[3]

The Government brings seven: It asks the Court to (1) preclude Alimehmeti from referring to the fact that certain materials were obtained through FISA searches; (2) admit into evidence certain terrorist propaganda materials recovered from Alimehmeti's personal devices in

---

[3] Alimehmeti later filed a supplemental letter alerting the Court that Alimehmeti had also once been adjudicated a youthful offender. *See* Dkt. 79.

his apartment; (3) admit evidence of Alimehmeti's receipt and dissemination of terrorist propaganda materials while detained in the Metropolitan Correctional Center ("MCC") following his arrest in this case; (4) preclude Alimehmeti from offering his own out-of-court hearsay statements; (5) preclude Alimehmeti from presenting an entrapment defense unless he proffers evidence capable of supporting such a defense; (6) take judicial notice at trial of the designation of ISIS as an FTO; and (7) implement certain protective measures relating to the testimony and section 3500 material of four undercover FBI employees. *See* Dkt. 72. The Government also filed under seal a classified motion pursuant to section 6 of CIPA providing further information in support of its argument for protective measures.

On December 12, 2017, the Court held a conference to arraign Alimehmeti on the Superseding Indictment. The Court also explored with counsel issues raised by the motions *in limine*. Relevant here, at that conference, the Government agreed to narrow in two ways the scope of its motion to admit terrorist propaganda materials that Alimehmeti had received and disseminated in the MCC. First, it agreed not to elicit at trial the identity of, or the offenses committed by, the persons with whom Alimehmeti had shared such materials, which included Ahmad Khan Rahimi, the alleged "Chelsea bomber" who was recently convicted on federal charges stemming from a September 2016 bombing in Manhattan. Second, it agreed not to establish or argue at trial that the sharing of propaganda materials in the MCC was itself a violation of any prison rule or discovery restriction.

On December 13, 2017, following up on the defense contention at the prior day's conference that the Superseding Indictment had materially expanded the issues to be tried, the Court directed the parties to file letters on that point. Specifically, the Court sought the parties' views whether, (1) before the Superseding Indictment, the defense could reasonably have

anticipated that the Government might contend in support of Count One that a reason Alimehmeti had sought to travel abroad was for the purpose of facilitating an act of international terrorism; and (2) whether evidence of such travel by Alimehmeti would have been admissible to establish that count. Dkt. 78. On December 21, 2017, the parties timely filed their responses. *See* Dkts. 80–81.

On December 21 and 22, 2017, respectively, Alimehmeti and the Government filed their oppositions to each other's motions *in limine*. *See* Dkts. 88, 92, 95.[4]

### C. Alimehmeti's Counsel's Potential Conflict

On December 21, 2017, the Government also raised for the first time a potential conflict of interest arising from Alimehmeti's having allegedly shared terrorist propaganda with other inmates in the MCC—the subject of one of the Government's pending motions. It noted that Alimehmeti's counsel, the Federal Defenders of New York (FDS), concurrently also represented the two other MCC inmates (Rahimi and a defendant referred to as "Defendant-1") alleged to have participated in the sharing with Alimehmeti of terrorist propaganda material. *See* Dkt. 80. The Government urged the Court to hold a hearing pursuant to *United States v. Curcio*, 680 F.2d 881, 889–90 (2d Cir. 1982), on that issue. The Court scheduled a conference for December 22, 2017 to address issues related to the potential conflict of interest. Dkt. 82.

On December 22, 2017, the Court conducted the first phase of a *Curcio* hearing. The Court explored with counsel the ways in which FDS's representations of its two other MCC-housed clients could affect its representation of Alimehmeti if the Court admitted the evidence of sharing of terrorist propaganda materials. The Court engaged in a colloquy with Alimehmeti to

---

[4] With one exception: With an extension granted by the Court, *see* Dkt. 84, Alimehmeti, on December 29, 2017, filed his brief in response to the Government's classified briefing on the motion *in limine* seeking, *inter alia*, partial courtroom closure.

7

assure his understanding of these issues. The Court also appointed Anthony Strazza, Esq., as conflict-free counsel to consult with and advise Alimehmeti on whether or not to waive the potential conflict presented by the concurrent representation. The Court scheduled a January 2, 2017 hearing to follow up on this inquiry, in the expectation that Alimehmeti would then be in position to knowingly waive—or decide not to waive—the potential conflict.

On December 28, 2017, FDS submitted a letter stating that, regardless of whether Alimehmeti waived the potential conflict, it would have to withdraw as his trial counsel if the Court admitted the evidence of Alimehmeti's sharing of terrorist propaganda material with its other two clients. It stated that FDS "will face irreconcilable ethical obligations if the Court admits the MCC evidence at [Alimehmeti's] trial," and that, "[u]nder those circumstances, [FDS] would ask to be relieved as counsel to all three defendants [*i.e.*, Alimehmeti, Rahimi, and the third defendant] because [FDS] do[es] not 'reasonably believe' that [it] will be able to provide competent and diligent representation to each affected client.'" Dkt. 93 at 1 (quoting N.Y. Rule of Prof'l Conduct 1.7(b)(1)).

On December 31, 2017, the Government responded. It argued that potential conflicts would exist affecting FDS's representations of all three clients regardless of whether the Court admitted the MCC evidence. It argued, however, that each client's conflict was waivable and that a *Curcio* inquiry ought to be conducted as to each client by the judge responsible for that client's case. The Government argued further that FDS's bid to withdraw was premature, pending the outcome of these *Curcio* proceedings, including Alimehmeti's. *See* Dkt. 94.

On January 2, 2018, the Court conducted the continuation of the *Curcio* hearing. On questioning from the Court, Alimehmeti requested more time to discuss conflict-related issues with Mr. Strazza. The Court therefore continued the *Curcio* hearing to January 5, 2018. At the

8

January 2 hearing, the Court also afforded defense counsel an opportunity, *ex parte*, to elaborate concretely on the ways in which conflict-free counsel might seek to combat the MCC evidence, and to elaborate upon why FDS's multiple representations might inhibit FDS from pursuing some of these avenues.

## III.   Applicable Legal Standards

"The purpose of an *in limine* motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Hart v. RCI Hosp. Holdings, Inc.*, 90 F. Supp. 3d 250, 257–58 (S.D.N.Y. 2015) (internal quotation marks omitted).  Evidence should not be excluded on a motion *in limine* unless it is "clearly inadmissible on all potential grounds." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. L.E. Myers Co. Grp.*, 937 F. Supp. 276, 287 (S.D.N.Y. 1996) (internal quotation marks omitted).  A court's ruling on such a motion is "subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in [a party's] proffer." *Luce v. United States*, 469 U.S. 38, 41 (1984).

Several issues raised by the motions *in limine* here turn on application of Federal Rule of Evidence 403.  That Rule provides that a district court may exclude "relevant evidence"— defined elsewhere as material evidence having "any tendency to make a fact more or less probable than it would be without the evidence," Fed. R. Evid. 401—if its probative value is substantially outweighed by a danger of one or more of the following: "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

## IV.    Analysis

The Court will first address Alimehmeti's motion; then the Government's; and then the parties' dispute whether the Superseding Indictment materially altered the issues in this case.

### A.    Alimehmeti's Motion

Alimehmeti seeks an order barring the Government from introducing evidence of his prior convictions, should he testify. Def. Mot. at 1–2. On September 6, 2012, Alimehmeti pleaded guilty to (1) assault in the third degree in violation of New York Penal Law § 120.00(1); (2) forcible touching in violation of New York Penal Law § 130.52; and (3) public lewdness in violation of New York Penal Law § 245.00(a). Earlier, Alimehmeti had once been adjudicated a youthful offender. *See* Dkt. 79.

Rule 609 permits impeachment by evidence of a criminal conviction where (1) the crime was a felony and, if the witness is a defendant, where the probative value of the evidence outweighs its prejudicial effect to that defendant, or (2) the crime, whether felony or misdemeanor, required the establishment of a dishonest act or false statement. Fed. R. Evid. 609(a)(1), (2). Where the conviction was a juvenile adjudication, such adjudication cannot be offered against the testifying defendant. *See* Fed. R. Evid. 609(d)(2).

The convictions here, Alimehmeti argues, are not properly received under Rule 609, because none was a felony, *see* Fed. R. Evid. 609(a)(1), and because none required proof of a dishonest act or false statement, *see* Fed. R. Evid. 609(a)(2). And, he argues, his youthful offense is inadmissible under Rule 609(d)(2). The Government, in response, states that it does not intend to seek to elicit the misdemeanor convictions or youthful offender adjudication at trial. Gov't Opp. at 2. But it reserves the right to seek leave to do so if the defense opens the door at trial to the subject. *Id.*

10

The Court grants Alimehmeti's motion to exclude such evidence. It is undisputed that Alimehmeti's misdemeanor convictions did not involve as an element dishonesty or a false statement. Accordingly, these are inadmissible under Rule 609. And the youthful offender adjudication is inadmissible under Rule 609(d). On the present record, there is no basis on which these could properly be admitted.

In so ruling, of course, the Court reserves the right for the Government to seek leave to offer such evidence in the event the trial takes an unexpected course. The Government is correct that under some circumstances, otherwise inadmissible criminal adjudications may be properly received on other grounds. If, for example, Alimehmeti were to offer testimony inconsistent with the existence of his prior offenses, such testimony might properly be rebutted by evidence of his convictions. *See* Fed. R. Evid. 404(a)(2)(A) ("[A] [criminal] defendant may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it."); Fed. R. Evid. 609, advisory committee note to 1974 enactment ("Notwithstanding [subdivision (a)], proof of any prior offense otherwise admissible under Rule 404 could still be offered for the purposes sanctioned by that rule. Furthermore, the committee intends that notwithstanding this rule, a defendant's misrepresentation regarding the existence or nature of prior convictions may be met by rebuttal evidence, including the record of such prior convictions."); *United States v. Weisser*, 417 F.3d 336, 346 (2d Cir. 2005) (approving impeachment on cross-examination through evidence of prior conviction "[o]nly after [the defendant] opened the door by testifying that he was not sexually interested in minors"). The Court's ruling granting Alimehmeti's motion *in limine* is premised on these doors not being opened at trial.

11

**B.      The Government's Motions**

**1.      Reference to FISA Searches**

On September 22, 2017, this Court denied Alimehmeti's motion to suppress certain

evidence obtained through FISA searches. Dkt. 67. The Government now seeks an order

precluding the defense from referencing at trial the fact that any piece of evidence derived from

FISA searches. Gov't Mot. at 9. The defense does not object, Def. Opp. at 1, and the Court

independently concludes that the order sought by the Government is warranted.

Where the Court has held lawful the process by which certain evidence was searched

and/or seized, the legal authority pursuant to which the searches and or seizures were conducted

is not relevant. *See United States v. Santiago*, 2 F. App'x 129, 130–31 (2d Cir. 2001) (jury

charge correctly stated the law in directing jury not to consider whether it approved or

disapproved of how certain properly admitted evidence was obtained); Transcript, *United States

v. El Gammal*, No. 15 cr. 588 (ER), Dkt. 142 at 25 (Dec. 29, 2016) ("[T]he mere fact that some

evidence was derived from a FISA-authorized search is irrelevant to any issue that the jury

would have to find at trial."). Here, the Court has held lawful the receipt of the FISA evidence;

the legal authority pursuant to which this evidence was obtained is, therefore, irrelevant. And

permitting reference to FISA searches at trial risks unfair prejudice to both sides. It may harm

the Government to the extent jurors may have negative views, or be confused, about these law

enforcement techniques; it may harm the defendant to the extent jurors may infer from the fact

that FISA procedures were used that the defendant has been deemed a threat to national security

and is therefore more likely guilty of the pending charges.[5]

---

[5] Reference at trial to the fact that certain evidence was received pursuant to FISA enhances the
risk that follow-on questioning, undertaken to contextualize this fact, might inadvertently reveal

Accordingly, the Court precludes any reference to or cross-examination on the fact that certain materials were obtained through FISA searches.

### 2. Pre-Arrest Evidence of Terrorist Propaganda Materials

The Government seeks to introduce certain pro-terrorist propaganda videos, images, audio files, and documents recovered from electronic devices seized from Alimehmeti's home. Gov't Mot. at 14. Although the Government reserves the right to alter its final list of exhibits to be offered at trial, *id.* at 19, it currently anticipates offering:

> (1) Portions of ISIS propaganda films glorifying ISIS and calling for Muslims around the world to join the cause. The videos include extensive, sometimes graphic violence. The Government represents that it will refrain from offering any footage of executions or any footage showing severed heads or mutilated bodies.
>
> (2) Images promoting jihad and ISIS without any depiction of graphic violence.
>
> (3) Portions of audio files containing lectures by al-Awlaki.
>
> (4) Portions of audio files containing music celebrating jihad, ISIS, and Osama bin Laden.
>
> (5) Pro-ISIS documents promoting ISIS and terrorism, including one depicting a group of prisoners about to be beheaded.

*Id.* at 17–19.

The Government argues that Alimehmeti's possession of these materials is admissible for two purposes: first, as direct evidence of his motive and intent to provide support to ISIS, and, second, to demonstrate his knowledge that ISIS was a designated FTO or a group engaged in

---

classified information. While this fact is not necessary to Court's decision applying Rule 403, it points to the same conclusion.

"terrorist activity" or "terrorism," which knowledge is an element of the offense charged in Count One. *Id.* at 20–28.[6]

Alimehmeti concedes that the materials he possessed, as a general proposition, are relevant evidence. Def. Opp. at 4. Nevertheless, he urges the Court to preclude some portions of them under Rule 403 as cumulative, as unfairly prejudicial, and/or as rendered irrelevant by an anticipated stipulation. *Id.* at 5. Specifically, he argues, first, that evidence of this nature that is received ought to be limited in quantity, and in particular that the jury should not be exposed excessively to materials that depict graphic violence. *Id.* at 5–7. Second, he represents that the defense is prepared to stipulate at trial that Alimehmeti knew that ISIS was either a designated FTO or a group that engages in "terrorism" or "terrorist activity." *Id.* at 1, 4. That concession, he argues, should preclude the Government from relying on the propaganda materials he possessed to prove his knowledge that ISIS was a designated FTO or involved in terrorism. *Id.* at 4–5.

The Court will permit the materials possessed by Alimehmeti to be received at trial, subject to appropriate limitations to guard against unfair prejudice and cumulativeness at trial. This evidence is highly probative as to multiple issues at trial.

First, as Alimehmeti is charged with *knowingly* providing or attempting to provide material support, the Government must prove that Alimehmeti acted intentionally, rather than by

---

[6] The Government separately states in a conclusory footnote that, if not admissible as direct evidence, Alimehmeti's possession of these materials independently would be "admissible pursuant to Rule 404(b) as other act evidence of Alimehmeti's preparation, plan, knowledge, motive, intent, absence of mistake, and lack of accident." *Id.* at 28 n.8. Because the Court here holds these materials substantially admissible as direct evidence under Rules 402 and 403, and because the Government has not developed a distinct argument under Rule 404(b), the Court declines to address here the Government's claim of an alternative basis for admission under that Rule.

14

mistake or accident. *See United States v. Al-Kassar*, 660 F.3d 108, 129 (2d Cir. 2011).[7] The propaganda materials bear on whether Alimehmeti had the required state of mind. Alimehmeti's possession of them suggests that he was supportive of terrorist ideology in general and of ISIS in particular. The inference logically follows that any acts of support Alimehmeti provided or attempted to provide to ISIS, including by traveling abroad himself or by facilitating the travel of another, were provided with awareness that they would tend to support ISIS, and for reasons relating to ISIS. *See United States v. Abu-Jihaad*, 630 F.3d 102, 133–34 (2d Cir. 2010) (affirming holding that "the pro-jihadist contents of the videos were relevant to understanding [the defendant's] motive and intent").

Second, such materials provide important "background for the events alleged in the indictment" and "enable the jury to understand the complete story of the crimes charged." *United States v. Reifler*, 446 F.3d 65, 91–92 (2d Cir. 2006). Here, the materials are essential context for the Government's allegations that Alimehmeti became radicalized—and thereby developed a motive and intent to provide support for ISIS—at least in part through his exposure to and apparent enthusiasm for such materials. *See United States v. Salameh*, 152 F.3d 88, 110–11 (2d Cir. 1998) (per curiam) (affirming admission of materials including videotape of bombing in part because they provided relevant background).

Third, Alimehmeti has indicated that he may pursue an entrapment defense at trial. *See infra* section IV.B.5. To the extent he does so, the propaganda materials bear, potentially quite significantly, on whether Alimehmeti was predisposed to provide material support to ISIS. Specifically, his possession of these materials tends to support an inference that as a result of his

---

[7] The Government need not prove, however, that Alimehmeti harbored a "specific intent to further the organization's terrorist activities." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 16–18 (2010).

enthusiasm for and devotion to ISIS, Alimehmeti was "ready and willing without persuasion to commit the crime charged and awaiting any propitious opportunity to do so." *See United States v. Salerno*, 66 F.3d 544, 547 (2d Cir. 1995) (internal quotation marks omitted).

Fourth, and finally, some of these materials tend to demonstrate Alimehmeti's knowledge that ISIS was a designated FTO or involved in terrorism. Specifically, the jury may infer such knowledge from Alimehmeti's possession of materials describing or depicting acts of terrorism undertaken by ISIS. And it is no answer that Alimehmeti is prepared to stipulate that he knew ISIS was a designated FTO or engaged in terrorism, *see* Def. Opp. at 4–5, as it is well established that, ordinarily, the Government is entitled to prove its case and develop its narrative in the manner it sees fit, subject to Rule 403, notwithstanding a defense offer to stipulate. *See Old Chief v. United States*, 519 U.S. 172, 187–89 (1997); *see also Salameh*, 152 F.3d at 122 (citing *Old Chief* to admit testimony and photographs of bombing victims notwithstanding defendants' offer to stipulate to their death and injury).

To be sure, as the defense properly notes, aspects of the materials Alimehmeti possessed do implicate countervailing interests under Rule 403. In particular, as the Government's motion itself recognizes, it will be important to limit in scope the materials displayed to the jury that contain particularly graphic violence, because such imagery may create unfair prejudice in a case where the defendant is not alleged himself to have engaged in or promoted violence of this nature. Secondarily, while the volume of terrorist propaganda material that Alimehmeti possessed is properly made known to the jury, it is conceivable that the manner by which voluminous material is published to the jury could implicate considerations of delay.

At this stage, however, the Court is unable to apply these familiar principles, because the Government has not yet identified the particular exhibits of this nature that it intends to offer, or

16

the means by which it proposes to publish them, and the defense has not yet had an opportunity to make arguments keyed to specific aspects of the Government's offered proof. The Court thus cannot conduct a granular balancing analysis under Rule 403—*i.e.*, it cannot evaluate the materials "in their entirety" before deciding whether, for example, Rule 403 requires "approving only selected excerpts for display to the jury." *Abu-Jihaad*, 630 F.3d at 133. To avoid delay during trial, the Court expects the Government, meaningfully in advance of trial, to identify for the defense the specific exhibits of this nature it seeks to offer, so that any disputes between the parties as to the application of Rule 403 can be crystallized and resolved expeditiously.

To the extent the defense offers to stipulate to Alimehmeti's knowledge of ISIS's status as a designated FTO or involved in terrorism, such a stipulation may bear on the volume of materials possessed by Alimehmeti that are received at trial to establish this aspect of his state of mind. But, as discussed above, the Government is entitled, subject to Rule 403, to tell its story. Provided that the materials that the Government would offer to establish Alimehmeti's knowledge of ISIS's designation and its involvement in terrorism do not themselves cause unfair prejudice (*e.g.*, they do not consist of cumulative imagery of extreme violence) or material delay, the Court will not preclude the Government from using such materials to establish such knowledge on Alimehmeti's part.

The Court, of course, will instruct the jury as to the purposes for which these materials may properly be considered. The Court invites counsel to propose, in writing, instructions toward that end.

### 3. Post-Arrest Evidence of Sharing of Terrorist Propaganda Material

The Government also seeks to introduce evidence that, since his arrest in this case, Alimehmeti has participated in the receipt and dissemination of terrorist propaganda materials

17

within the MCC. The Government learned of this conduct in late November 2017, as a result of a report from an MCC inmate, referred to in the Government's submissions as Defendant-1. Although the Government represents that it continues to gather evidence, at minimum it seeks at trial to introduce evidence that:

> (1) Alimehmeti, while housed in the MCC, possessed a hard drive modified to remove his discovery materials. This drive was found to contain terrorist propaganda materials that had been produced to Rahimi in discovery in connection with Rahimi's trial. These materials were not among the discovery produced to Alimehmeti.

> (2) Rahimi possessed a notebook itemizing terrorist propaganda files, which included files produced in discovery to Alimehmeti and which had been present on Alimehmeti's hard drive.

> (3) Defendant-1 possessed a disc containing propaganda materials originating from discovery produced to Alimehmeti and Rahimi.

*See* Gov't Mot. at 29–31.

The Government argues that the fact that Alimehmeti received and distributed such materials is admissible under Rules 403 and 404(b). As noted, however, at the Court's suggestion, the Government has agreed at trial not to elicit Rahimi's identity or the specific offenses of which Rahimi was convicted, because associating Alimehmeti before the jury with an individual convicted of a notorious act of violent terrorism in New York City would carry obvious risks for unfair prejudice. *See* Dkt. 80 at 9 n.6. Further, the Government has agreed not to elicit evidence or argue that the sharing of propaganda materials in the MCC was a violation of any prison rule or discovery restriction. That limitation on the Government's proof also avoids unfair prejudice, insofar as such evidence would alert the jury to a separate, post-charge infraction by Alimehmeti. It also avoids the potential delay and confusion that inquiry into the propriety of such sharing would entail. Otherwise, there would likely be a need for evidence and examination of witnesses as to applicable rules and restrictions and the means by which

Alimehmeti and perhaps the other inmates were made aware of them. Such a "trial within a trial" as to whether rules were knowingly broken could also easily implicate attorney-client communications.

With those important limitations, the Court holds that evidence of Alimehmeti's receipt and distribution of propaganda materials in prison is admissible under Rule 404(b) and will be received at trial. Rule 404(b) provides:

> Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

Fed. R. Evid. 404(b)(1). But, the Rule further provides, such evidence "may be admissible"—for purposes other than a character trait or criminal propensity—to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *See* Fed. R. Evid. 404(b)(2). The Second Circuit takes an "inclusionary approach" to Rule 404(b), under which evidence of crimes, wrongs, and bad acts may be received "for any purpose other than to show a defendant's criminal propensity, as long as the evidence is relevant and satisfies the probative-prejudice balancing test of Rule 403." *See, e.g.*, *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (internal quotation marks omitted).

Tellingly, Alimehmeti's opposition brief nowhere disputes that this evidence would have a proper purpose under Rule 404(b), and rightly so. The Government does not propose to offer this evidence to show that, because Alimehmeti shared terrorist propaganda material with others in prison, it is more likely that he shared such material with others during the earlier time period covered by the Indictment. That inference, as to criminal propensity, would be prohibited by Rule 404(b). Rather, the Government seeks through this evidence to show Alimehmeti's support and commitment to ISIS. That in turn tends to show that any support he provided to ISIS during the period covered by the Indictment—whether in the form of facilitating another's travel,

19

facilitating his own travel, or otherwise—was provided knowingly and intentionally with the objective of helping ISIS. That Alimehmeti received and disseminated terrorist propaganda materials in the MCC is therefore probative of his knowledge and intent in undertaking the acts forming the basis of the Indictment. *See United States v. Mustafa*, 406 F. App'x 526, 528 (2d Cir. 2011) (affirming admission of 404(b) evidence that defendant had "associated with terrorist groups other than al Qaeda" because such evidence was "highly probative of [the defendant's] state of mind"). Evidence admitted for such a purpose is permissible under Rule 404(b).

As to the application of Rule 403, the factors as balanced by this Court favor admission. The intent underlying Alimehmeti's conduct during the period covered by the Indictment is squarely at issue. To establish guilt on Count One, the Government must establish, *inter alia*, that Alimehmeti knowingly and intentionally provided or attempted to provide material support to an FTO, which the Indictment identifies as ISIS. To establish guilt on Count Two as charged, the Government must establish, *inter alia*, that Alimehmeti made a false statement to secure a passport to facilitate an act of international terrorism. Apart from other lines of defense at trial, Alimehmeti can be expected to dispute whether his attempt to travel abroad or facilitate the travel of other(s) was motivated by an intention to provide support to ISIS. He has also indicated an intention to argue that, to the extent that he might be found to have taken action to provide such support, he was entrapped by the Government's undercover agents into doing so. In this context, Alimehmeti's post-offense sharing and receipt of terrorist propaganda material, including some relating to ISIS, is clearly probative, and perhaps highly so. His sending and receiving such material tends to show a durable commitment to terrorist organization(s). This conduct therefore makes it more likely that Alimehmeti's actions at issue were undertaken with the intention of assisting ISIS. And because government personnel presumably were not

20

involved in the prison sharing of terrorist propaganda material, this conduct tends to establish a predisposition to promote ISIS, thereby undermining any defense of entrapment.

In disputing relevance, Alimehmeti argues first that his post-arrest conduct is irrelevant to his *pre*-arrest state of mind. Def. Opp. at 10. He is at liberty to make that argument to the jury, and perhaps the jury will conclude either that Alimehmeti's sharing of propaganda within prison (if found) does not reveal a commitment at that time to ISIS or that if it does, Alimehmeti's commitment to ISIS while in prison in 2016 and 2017 bears little on his commitment to ISIS prior to his May 2016 arrest. But a rational jury could easily find the contrary. It could conclude that the assembled record, including Alimehmeti's post-arrest sharing of terrorist propaganda, reveals a steadfast, longstanding attachment to this cause, rather than a passing fancy. And the jury could also find this conduct highly probative as to the claim of entrapment, given the lack of any government inducement to so act while in the MCC. The jury would be well within its rights to find such conduct to be "independently motivated behavior" indicative of a prior predisposition to provide support to ISIS. *See United States v. Cromitie*, 727 F.3d 194, 209 & n.11 (2d Cir. 2013) (internal quotation marks omitted) (holding conduct post-dating contact with law enforcement may be admissible to show predisposition if "independent and not the product of the attention that the Government had directed at [the defendant]" (quoting *Jacobson v. United States*, 503 U.S. 540, 550 (1992))).

Alimehmeti next argues that the evidence is cumulative, because the jury will "already have seen essentially the same evidence offered for the same purpose (*i.e.*, to show the defendant's motive and intent while acting)." Def. Opp. at 11. That is wrong. Although evidence of terrorist propaganda materials possessed by Alimehmeti prior to his arrest will be before the jury, the evidence of his post-arrest dissemination and receipt of such materials has a

21

distinct purpose. It shows—or can be argued to show—his engagement with such materials over time (indicative of a durable commitment to terrorist organization(s)). And it can be argued to show that this commitment existed independent of his interactions with undercover officers and in an altogether new environment.

Third, Alimehmeti argues that the MCC materials, even if relevant, ought to be excluded because of countervailing factors under Rule 403, specifically, that receipt of this evidence risks undue delay and juror confusion. *Id.* at 11–13. Alimehmeti is correct that presenting the MCC materials will likely necessitate forensic testimony regarding where the files were found and the determinable circumstances as to how they were transferred among the affected computer facilities. A limited primer on what criminal discovery is and the manner in which inmates may come into contact will also presumably be needed. *See* Gov't Mot. at 36. But the Court has no reason to believe that this evidence, offered to supply context, will be time-consuming or occupy more than small fraction of a trial estimated to run two to three weeks.

As to the Rule 403 factor of unfair prejudice, although Alimehmeti is correct that proof of his sharing of terrorist propaganda materials in the MCC would reveal to the jury the fact of his pretrial incarceration, Def. Opp. at 12–13, this fact is unlikely to prove surprising to the jury given the nature of the charges here. More importantly, the Court stands ready to give a forceful limiting instruction as to this evidence, as this Court and others have done in cases in which a defendant's post-arrest statements or conduct while imprisoned is offered as substantive evidence of guilt at trial.[8] The Court is confident that such an instruction will be sufficient to

---

[8] For example, in *United States v. Urena and Vasquez*, S5 11 Cr. 1032 (PAE), the Court permitted evidence to be received that the defendants had verbally alerted to the arrival in the MCC of an alleged (now cooperating) co-conspirator whom they had not admitted to know. *See United States v. Delance*, 694 F. App'x 829 (2d Cir. 2017) (affirming convictions); *see also United States v. Mauro*, 80 F.3d 73, 76 (2d Cir. 1996) (affirming admission of evidence

Case 2:16-cr-00398-PAE   Document 96   Filed 01/05/18   Page 23 of 33

cure any prejudice from the revelation to the jury that Alimehmeti had been incarcerated, and invites counsel to propose such an instruction.

Otherwise, however, there is no serious claim of unfair prejudice from the evidence of the defendant's trafficking in such propaganda. There is no claim that these materials are qualitatively more disturbing or shocking than the materials resident on Alimehmeti's home devices. And to the extent that Alimehmeti argues that evidence of his sharing such material with other prisoners risked unfair prejudice by associating him with wrongful uncharged conduct, the Government's agreement not to identify Rahimi or Defendant-1 (by their names or crimes) or to prove or argue that sharing such material violated a prison or discovery rule avoids this concern.[9]

Alimehmeti's most substantial argument against admission of the evidence of sharing terrorist propaganda materials within the MCC is that admitting such evidence would likely result in the withdrawal or disqualification of his FDS counsel, given FDS's longstanding and ongoing representation of Rahimi and Defendant-1 and, *inter alia,* the possibility that at trial, Alimehmeti's counsel may have an interest in developing evidence and making arguments that assign responsibility for the sharing to these other clients.[10] This, Alimehmeti notes, would

---

revealing defendant's incarceration partly because court provided instruction that such evidence was to be considered "only as background information and as proof of motive").

[9] Notwithstanding this restriction on the Government's trial advocacy, the Court recognizes that the defense may conclude that it is worthwhile to identify Rahimi (and his offense) and Defendant-1 at trial, perhaps in support of the inference that these persons, with no involvement by Alimehmeti, were responsible for any sharing of the propaganda at the MCC. The defense may similarly wish to allege that these persons broke prison or discovery rules in so doing. The Court's ruling today does not restrict the defense from eliciting such proof, or consider the doors that such a line of examination might open to the Government.

[10] The Court here assumes *arguendo* that admission of the evidence of Alimehmeti's sharing of terrorist propaganda in the MCC with other FDS clients would result in FDS's withdrawal. This issue has been subject of written submissions and court colloquy and an in-progress *Curcio*

Case 1:16-cr-00398-PAE   Document 96   Filed 01/05/18   Page 24 of 33

deprive him of a productive relationship with longstanding assigned counsel at FDS and result in a delay of trial while successor counsel gets up to speed. Def. Opp. at 14–16; Dkt. 93. Although the Court recognizes these costs—and expresses its appreciation to FDS for its exceptional work in this matter and counsel's evident dedication to their client Alimehmeti—the Court's judgment is that these considerations do not justify the exclusion of this otherwise admissible and potentially quite significant evidence.

At the threshold, although this point is not necessary to the Court's ruling, the Court is not fully persuaded that Rule 403—in identifying "undue delay" and "unfair prejudice" as countervailing considerations to the admission of evidence—applies to the delay in initiation of trial or the harm caused by an evidentiary ruling that forces the pretrial withdrawal of now-conflicted counsel. Alimehmeti so argues but does not supply any authority to the effect that Rule 403 is properly implicated by such matters.[11] Although the Court enjoys wide discretion in applying Rule 403, *see United States v. Gabinskaya*, 829 F.3d 127, 134 (2d Cir. 2016), the Rules of Evidence, of which Rule 403 is a part, are concerned primarily with "ascertaining the truth and securing a just determination," Fed. R. Evid. 102. Accordingly, "the concern expressed by [terms such as 'unfair prejudice' and 'undue delay'] is a concern about distortion or delay of the fact-finding process, rather than harm to interests outside of the trial, even if those outside interests are interests of someone involved in the trial." Paul F. Rothstein, *Federal Rules of Evidence*, Rule 403 (3d ed. 2017); *see also United States v. Smithers*, 212 F.3d 306, 316 (6th Cir.

---

proceeding. The Court will take up this issue further with counsel and the defendant promptly following issuance of this decision.

[11] The Court has found one case supporting this position—a decision by the United States Court of Appeals for the Seventh Circuit that "the introduction of evidence that would generate a conflict of interest is subject to analysis under Rule 403." *United States v. Gearhart*, 576 F.3d 459, 464 (7th Cir. 2009).

2000) ("[T]he term 'delay' [in Rule 403] does not connote delay in the submission of motions or proffers; rather, it encompasses the prolonging of the length of the trial, and can be read properly in conjunction with the other exclusionary factors: 'waste of time, or needless presentation of cumulative evidence.'" (quoting Fed. R. Evid. 403)). Presumably for that reason, evidence treatises that address the countervailing harms cognizable under Rule 403 primarily do so in terms of their effects on the *fact-finder* at trial. *See, e.g.*, 1 *McCormick on Evidence* § 185 at nn.51–65 (7th ed. 2016). Here, of course, the Court has already held that the MCC evidence will not compromise the jury's fact-finding. On the contrary, this evidence, though acquired relatively late in the pretrial process, is a consequential part of the Government's anticipated case.

The Court nevertheless assumes *arguendo* that it is permitted—either under Rule 403 or under the Court's inherent supervisory power[12]—to consider the adverse consequences on Alimehmeti as to the delay of the trial's start and as to the disruption of his representation, and to exclude such evidence if these factors outweigh its probative value. While not minimizing these adverse impacts, the Court's judgment is that the value of the evidence at issue to the truth-seeking process is not outweighed, let alone substantially, by these harms.

First, and foremost, for the reasons noted, the evidence at issue—Alimehmeti's sharing of terrorist propaganda materials with other persons in the months and year following his arrest—is both highly probative and potentially highly consequential to central issues at trial. Exclusion of

---

[12] *Cf. Link v. Wabash R.R.*, 370 U.S. 626, 630–31 (1962) (discussing courts' "'inherent power' . . . to manage their own affairs so as to achieve the orderly and expeditious disposition of cases"); *Wheat v. United States*, 486 U.S. 153, 160 (1988) ("Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.").

this evidence in the service of his continued representation by FDS would deprive the jury of relevant, probative evidence in derogation of the search for truth in this important case.

And as for the harm side of the ledger, the decision to admit the MCC evidence will not leave Alimehmeti without able counsel. Assuming this ruling results in FDS's withdrawal, the Court will appoint highly able successor counsel. Such counsel will not labor under any potential conflict.[13] The Court will also assure in appointing any successor counsel that such counsel is available to try this case on as prompt a timetable as possible, consistent with adequate preparation. Successor counsel will also have the benefit of FDS's considerable work product, knowledge capital, and briefing. The Court expects that during the transition to new counsel, FDS would work closely to guide successor counsel on the significant aspects of this case that are uncompromised by the newly acquired MCC evidence.

Finally, to the extent that considerations of fairness and fair play are germane, the Court observes that any delay here is attributable only to Alimehmeti. Although the Government's allegations remain unproven, the evidence as to the presence of Rahimi's discovery on Alimehmeti's hard drive, and of Alimehmeti's discovery or summaries of it in the possession of Rahimi and Defendant-1, provides a substantial basis on which to infer that Alimehmeti at least played a role in the sharing of terrorist propaganda material within the MCC. To be sure, Alimehmeti may not have known that FDS represents the other two inmates or even that one of his two trial lawyers had been Rahimi's trial counsel. And he presumably did not envision that the sharing of these records, if discovered, might create a conflict for his trial counsel. But, as

---

[13] Although the admission of evidence of the sharing of terrorist propaganda in prison presents the most obvious conflict, the Government fairly notes that even if this evidence were excluded, there would still be other arguable bases for asserting a conflict among FDS's representations, meriting, at least, a *Curcio* proceeding as to each of Alimehmeti, Rahimi, and Defendant-1.

26

among trial participants, the present predicament lies exclusively at his doorstep. The Government, by contrast, immediately notified Alimehmeti's counsel upon learning of the sharing of the propaganda materials within the MCC. *See* Dkt. 94. And the Government, reasonably soon thereafter, notified the Court of a potential conflict. *See* Dkt. 80. The Government likewise appears to be moving with dispatch to complete a forensic analysis of the computer evidence at issue. Thus, although the point is not determinative of the Court's balancing analysis, the Court is mindful that the party that is the proponent of the evidence in question, the Government, has clean hands.

In sum, in view of the substantial probative value of the MCC evidence, the Court holds that the value of this evidence outweighs the assembled countervailing interests, whether considered under Rule 403 or pursuant to the Court's supervisory authority. The Court will therefore receive at Alimehmeti's trial evidence of the sharing of terrorist propaganda material within the MCC between Alimehmeti and the other two FDS-represented inmates. The Court accordingly grants the Government's *motion in limine* to admit such material.[14]

### 4.      Alimehmeti's Out-of-Court Statements

The Government argues next, as a general proposition, that Alimehmeti "should not be permitted to offer his own out-of-court statements . . . unless and until [he] establishes that [such a] statement is admissible pursuant to a hearsay exception or provision of law." Gov't Mot. at 40. This motion is unproductive at this juncture. The Court fully intends to assure compliance by both parties with the Federal Rules of Evidence. If and when counsel for Alimehmeti forms

---

[14] More fine-tuned assessments of admissibility at trial as to particular aspects of such evidence may need to be made later, including after a forensic analysis or analyses of these materials is complete. The Court's ruling is without prejudice to Alimehmeti's right to argue that particular aspects of the Government's trial evidence on this point are inadmissible.

27

an intention to elicit his own statements, the Court expects that counsel will alert the Court in advance, so as to permit the Court to assess whether the statement in question falls within an exception to the hearsay rule or is admissible pursuant to the rule of completeness, under which statements may be admitted as "necessary to explain [an admitted portion of the defendant's statement], to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion," *United States v Johnson*, 507 F.3d 793, 796 (2d Cir. 2007) (internal quotation marks omitted). But no such notice has been given and there is as yet no crystallized dispute.

The Court therefore denies this motion as premature. This ruling is without prejudice to the Government's right later to challenge admission of statements by Alimehmeti that the defense seeks to offer.

### 5.    Entrapment Defense

The Government next argues that "there is no factual basis to support an entrapment defense in this case," and that the Court should "preclude the defendant from asserting the defense unless and until he proffers evidence to support it, which he cannot." Gov't Mot. at 50. The Court denies this motion.

"[A] valid entrapment defense has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." *Mathews v. United States*, 485 U.S. 58, 63 (1988). "[A] defendant hoping to assert the entrapment defense bears the burden of establishing inducement by a preponderance of the evidence." *United States v. Brand*, 467 F.3d 179, 190 (2d Cir. 2006). If the defendant meets that burden, "[t]he burden then shifts to the government to show that the defendant was predisposed

28

to commit the crime beyond a reasonable doubt." *United States v. Gagliardi*, 506 F.3d 140, 149 (2d Cir. 2007).

"The question of entrapment is generally one for the jury, rather than for the court." *Mathews*, 485 U.S. at 63; *accord United States v. Kopstein*, 759 F.3d 168, 181 (2d Cir. 2014). A defendant is entitled to an entrapment instruction if there "exists evidence sufficient for a reasonable jury to find in [the defendant's] favor." *Mathews*, 485 U.S. at 63. In determining whether to provide such an instruction, "the trial judge must consider the evidence in the light most favorable to the defendant." *United States v. Anglada*, 524 F.2d 296, 298 (2d Cir. 1975). At this stage, therefore, the Government must persuade the Court that no matter how the facts may unfold at trial, no reasonable juror could conclude that Alimehmeti was entrapped.

While the Court will entertain argument at the end of the evidence as to whether or not the evidence supports an entrapment defense so as to warrant giving an entrapment instruction, the Court is unpersuaded, based on the parties' proffers of the evidence, that it is inconceivable that the trial evidence will be able to support such an instruction.

With respect to inducement, whether or not Alimehmeti was "already an established ISIS supporter," Gov't Mot. at 48, the Government acknowledges that an undercover agent asked Alimehmeti to assist another undercover agent in preparing for his journey to Syria, *id.* at 7. On the basis of the parties' proffers, therefore, it appears that defense can at least colorably argue that the Government "initiat[ed] or "solicit[ed]" an aspect of the conduct alleged to constitute material support for ISIS. *See United States v. Dunn*, 779 F.2d 157, 159 (2d Cir. 1985).

And with respect to predisposition, as to which the burden of proof beyond a reasonable doubt would ultimately be on the Government, the Court—without the benefit of a full trial record—cannot determine conclusively that the evidence will permit only the conclusion that

29

Alimehmeti was predisposed to provide material support to ISIS. It may be that, at trial, the Government adduces, as it forecasts, "an array of evidence" predating or independent of Alimehmeti's contacts with law enforcement that demonstrate his "radicalization, his support for terrorist ideology and particularly ISIS, and his desire to travel, and help others travel, to ISIS-controlled territory." Gov't Mot. at 42. But the Court cannot find these facts now. To choose just one example, as to the Government's claim that Alimehmeti attempted to facilitate the travel of an ISIS supporter as early as 2014, *id.* at 43, the defense "strongly dispute[s]" this claim and the Government's characterization of these events, Def. Opp. at 31–32. Pending trial, the Court cannot resolve whether there is evidence on which the jury could find for the defense on this point. Because the evidence may ultimately permit a non-"frivolous" entrapment defense, *Kopstein*, 759 F.3d at 181–82 (internal quotation marks omitted), the Court denies the Government's motion.

This decision, however, does not dictate how the Court will ultimately instruct the jury as to the availability of an entrapment defense. If the defense chooses to pursue the defense but the evidence adduced is legally insufficient to support it, the Court will consider instructing the jury that entrapment is not an available defense in this case. *See, e.g., United States v. Absolam*, 305 F. App'x 786, 788–89 (2d Cir. 2009).

### 6.    Judicial Notice of ISIS as FTO

Alimehmeti is charged in Count One with providing material support to a designated FTO in violation of 18 U.S.C. § 2339B. Dkt. 70. The Government asks that the Court take judicial notice at trial of the designation of ISIS as an FTO. Gov't Mot. at 52. The defense has indicated that it is willing to stipulate to ISIS's designation as an FTO, obviating a need for judicial notice. Def. Opp. at 1.

The Court encourages the parties so to stipulate. Failing an adequate stipulation on this point, the Court will grant the Government's motion and so-order the Government's proposed order attached to its brief as Exhibit A. Gov't Mot. at Ex. A; *see* Order, *United States v. El Gammal*, No. 15 Cr. 588 (ER), Dkt. 139 (Jan. 3, 2017).

### 7. Protective Measures

As indicated above, the Court will address the propriety of courtroom closure and other protective measures in a separate decision.

### C. The Effect of the Superseding Indictment

Independent of the pending motions, defense counsel has suggested that the Superseding Indictment modifying Count Two materially altered the issues to be tried. Although the defense does not claim prejudice, argue that the timing of the Superseding Indictment contravened a deadline, or seek concrete relief, the Court nevertheless, in the interest of assuring a complete record, addresses this contention.

As noted, the Superseding Indictment leaves Count One unchanged. But as to Count Two, which alleges a false statement in an application for a passport in violation of 18 U.S.C. § 1542, the Superseding Indictment adds one allegation: that the purpose for which Alimehmeti sought a new passport was to "facilitate the provision of personnel, including himself, to ISIS." This allegation introduces a new element, the satisfaction of which would increase Alimehmeti's sentencing exposure from 10 to 25 years' imprisonment.[15]

---

[15] A criminal defendant is exposed to a greater maximum sentence where he makes a false statement in a passport application specifically so as to "facilitate an act of international terrorism." 18 U.S.C. § 1542.

31

The defense argues that, before the Superseding Indictment, Alimehmeti's purpose in seeking to travel was not within the scope of the charges in this case. And, it suggests, the Government's intention to argue that Alimehmeti had acted with such a purpose had not been suggested by the Complaint on which he was arrested, the original Indictment, or the Rule 16 discovery. *See* Dkt. 81 at 1.

On its review of these materials, the Court rejects the defense's contention as highly unpersuasive. The Court finds that the Superseding Indictment did not materially change the issues in this case. Rather, its modification of Count Two made an issue that was already front and center in the case the subject of a potential sentence enhancement.

Most important, the initial Indictment squarely put at issue Alimehmeti's purpose in traveling to the United Kingdom. It alleged, in connection with Count One, that Alimehmeti "did knowingly and intentionally provide 'material support or resources,' as that term is defined in Title 18, United States Code, Section 2339A(b), to wit, personnel (*including himself*) and services, to a foreign terrorist organization, and attempt to do the same . . . ." Dkt. 8 (emphasis added). This language announced plainly that Alimehmeti's material support, as charged, included providing himself as "personnel . . . to a foreign terrorist organization," rather than exclusively providing assistance to ISIS while remaining within the United States. It alone put the defense on notice that the Government intended to prove and argue, at least in connection with Count One, that a goal of Alimehmeti's in traveling abroad—and therefore a purpose of his in securing a new passport—was to facilitate the provision of himself as personnel to ISIS. And the Complaint on which Alimehmeti had previously been arrested was in accord, making clear that Alimehmeti in fact did travel abroad and intended to do so again. It alleged that Alimehmeti had taken two trips to the United Kingdom in 2014, *id.* ¶ 7, and had "admitted" that he "wanted a

32

new passport because he believed traveling on his old passport, which had rejection stamps from his two 2014 trips to the United Kingdom—would raise suspicions during his planned travels," *id.* ¶ 16. Accordingly, it alleged, consistent with the subsequent Superseding Indictment, that he had "attempted to fraudulently obtain an additional United States passport, because he believed that doing so would facilitate his own travel overseas." Dkt. 1 at ¶ 6.

The Court therefore rejects any claim of unfair surprise. At all times since the return of the original Indictment, Alimehmeti has been on notice of—and had a clear incentive to seek to disprove at trial—the Government's allegation that Alimehmeti's foreign travel was intended at least in part to provide himself as personnel to an FTO. The Superseding Indictment, by adding that allegation to Count Two, did not add that contention to the case. It merely gave Alimehmeti an additional incentive to prepare to meet the Government's evidence on that point.

## CONCLUSION

For the foregoing reasons, the Court resolves the pending motions *in limine* as set forth herein. The Clerk of Court is respectfully directed to terminate the motions pending at Dkts. 72 and 74.

SO ORDERED.

_Paul A. Engelmayer_
Paul A. Engelmayer
United States District Judge

Dated: January 5, 2018
      New York, New York